E-FILED; Prince George's Circuit Court
Docket: 12/13/2024 5:11 PM; Submission: 12/13/2024 5:11 PM
Envelope: 19184235

## IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND
14735 Main Street, Upper Marlboro, Maryland 20772

RS

CHARLENE HALL,
individually and on behalf of all
others similarly situated,
  c/o Justly Prudent
  1140 3rd St. NE, Suite 2180
  Washington, DC 20002

     Plaintiff,

  v.

HEATHER HILL PROPERTY COMPANY LLC,
  c/o The Corporation Trust Incorporated
  2405 York Road
  Lutherville Timonium, MD 21093

HEATHER HILL OPERATING COMPANY LLC,
  c/o The Corporation Trust Incorporated
  2405 York Road
  Lutherville Timonium, MD 21093

ONEWALL COMMUNITIES LLC,
  c/o The Corporation Trust Incorporated
  2405 York Road
  Lutherville Timonium, MD 21093

     Defendants.
_____/

Case No.  C-16-CV-24-005992

DEMAND FOR JURY TRIAL

## CLASS ACTION COMPLAINT

Plaintiff Charlene Hall ("Ms. Hall"), individually and on behalf of all others similarly

situated, brings this Class Action Complaint against Defendants Heather Hill Property Company

LLC, Heather Hill Operating Company LLC, OneWall Communities LLC, and alleges upon

personal knowledge as to her own actions, and upon information and belief as to all other

matters, as follows:

## INTRODUCTION

1.      This class action arises from Defendants' systematic and pervasive failure to maintain habitable living conditions at Heather Hill Apartments ("Heather Hill"), a 459-unit apartment complex located in Temple Hills, Maryland, while operating without required licenses and collecting rent and fees in violation of Maryland law.

2.      Since acquiring Heather Hill in April 2022, Defendants have operated the property without the required multi-family dwelling license from Prince George's County, in violation of local housing codes and Maryland law. During this period, Defendants continued to collect rent from tenants while failing to maintain the property in a habitable condition.

3.      Defendants have allowed Heather Hill to deteriorate into deplorable conditions, with widespread issues including sewage backups, water leaks, mold, pest infestations, and numerous fire and safety code violations. Despite receiving countless maintenance requests and complaints from tenants, Defendants have consistently failed to make necessary repairs or address these serious habitability issues.

4.      When Defendants finally applied for a temporary license in May 2024, it was void due to outstanding violations. The temporary license was subsequently suspended in August 2024 after Heather Hill failed a fire safety inspection. Despite having no valid license, Defendants continued to collect rent and threaten tenants with eviction.

5.      Through this action, Ms. Hall seeks to remedy Defendants' violations of Maryland consumer protection laws and obtain relief for herself and all other similarly situated tenants who have suffered damages due to Defendants' unlawful conduct.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over this action under Md. Code Ann., Cts. & Jud. Proc. § 1-501.

7.      This Court has personal jurisdiction over Defendants because they conduct business in Maryland, own and operate real property in Maryland, and the acts and omissions giving rise to this action occurred in Maryland.

8.      Venue is proper in this Court under Md. Code Ann., Cts. & Jud. Proc. § 6-201(a) because the Defendants carry on a regular business in Prince George's County. Venue is further proper under Md. Code Ann., Cts. & Jud. Proc. § 6-203 because the real property at issue is situated within Prince George's County.

## THE PARTIES

9.      Plaintiff Charlene Hall is a resident of Prince George's County, Maryland, and a tenant at Heather Hill Apartments.

10.     Defendant Heather Hill Property Company LLC is a Delaware limited liability company with its primary place of business at 707 Summer Street, 5th Floor, Stamford, Connecticut 06901. It registered with the Maryland State Department of Assessments and Taxation ("SDAT") on February 10, 2022, and is the owner of Heather Hill Apartments.

11.     Defendant Heather Hill Operating Company LLC is a Delaware limited liability company with its primary place of business at 707 Summer Street, 5th Floor, Stamford, Connecticut 06901. It registered with SDAT on January 31, 2022, and operates as the master lessee and property manager for Heather Hill Apartments.

12.     Defendant OneWall Communities LLC is a New York limited liability company with its primary place of business at 707 Summer Street, 5th Floor, Stamford, Connecticut

06901. It registered with SDAT on April 23, 2021, and has operated as a property manager of
Heather Hill Apartments.

## BACKGROUND

### *Common Scheme and Enterprise*

13.      Between April 2022 and the present, Defendants have engaged in a common
scheme to operate Heather Hill Apartments without required licensing while collecting rent from
tenants despite widespread uninhabitable conditions.

14.      Defendants operate as a single enterprise with respect to Heather Hill. Defendant
Heather Hill Property Company LLC owns the property but has delegated operational control to
Heather Hill Operating Company LLC as master lessee. OneWall Communities LLC manages
the property and directs all communications with tenants.

### *Defendants' Unlicensed Rental Operations*

15.      Defendants purchased Heather Hill in April 2022. Under Section 13-186(b) of the
Prince George's County Code, Defendants had 30 days following purchase to apply for a multi-
family dwelling license.

16.      Defendants failed to apply for or obtain the required license for approximately 25
months, from April 2022 until May 7, 2024.

17.      During this unlicensed period, Defendants: (a) advertised and showed apartments
to prospective tenants; (b) entered into new lease agreements; (c) renewed existing leases; (d)
collected rent and other fees; (e) assessed late fees; and (f) filed over 130 failure-to-pay rent
actions against tenants.

18.      When Defendants finally applied for a temporary license on May 7, 2024, it was
void on its face due to numerous outstanding violations.

19.     On August 4, 2024, Heather Hill failed a Fire Safety Inspection, leading to suspension of the temporary license on August 5, 2024.

20.     Despite lacking valid licensing, Defendants continue to collect rent and threaten tenants with eviction, as evidenced by their August 19, 2024 notice to tenants demanding rent payments and warning of late fees.

### *Widespread Habitability Issue*

21.     Tenant interviews, property inspections, and notices of violation reveal pervasive habitability issues affecting the entire Heather Hill community, including water and sewage problems, pest infestations, health and safety violations, a pattern of failed maintenance, and severe health impacts on tenants caused by black mold and other unsanitary conditions.

22.     Multiple buildings at Heather Hill suffer from recurring sewage backups in sinks, toilets, and bathtubs. For example: (a) tenant Juanita Caldwell reported sewage backups in her master bathroom tub "multiple times" throughout her tenancy; (b) tenant Kemba Colvin's bathroom fixtures "always smell of sewage and waste backups"; (c) tenant Tiara Perry experiences constant sewage backups in her kitchen sink due to damaged pipes that Defendants have failed to repair despite contractor confirmation of the issue; and (d) tenant MarQuetta Parks endured daily occurrences of brown water flowing from her tub faucet, accompanied by sudden water shutoffs.

23.     Water leaks and flooding are common throughout the complex. Tenant Darlene Johnson has persistently reported water/urine leaks from her bathroom ceilings since 2019. Defendants failed to address, or otherwise ignored, Ms. Johnson's maintenance requests regarding the issues. Tenant Jerrell Shuford experienced a major leak in his master bathroom that led to widespread black mold growth. Defendants failed to address, or otherwise ignored, Mr.

Shuford's maintenance requests regarding the issue. Tenant Alicia Hall frequently reported yellowish water coming out of her apartment's faucets. Several other tenants have reported water damage to their property that Defendants refuse to replace.

24.    The entire Heather Hill property is infested with various pests, including: (a) widespread roach infestations reported by dozens of tenants, including Ms. Hall; (b) bat infestations in common areas and third floor units; and (c) rodent infestations. For example: (i) tenant Juanita Caldwell reported roach nests behind her refrigerator and stove; (ii) tenant Kelly Wright experienced a severe gnat infestation; and (iii) tenant Tiara Perry encountered mice, roaches, water bugs, bats, and snakes throughout her apartment and/or the common areas of the apartment complex. Furthermore, multiple tenants, such as Tracie Caudle, reported bat infestations in common areas and third floor units.

25.    Defendants' pest control efforts have been inadequate or non-existent. Tenant Kemba Colvin reported that management "claims to put your unit on a list but never shows up." Multiple tenants have been forced to pay for their own pest control because of Defendants' failure to adequately address the widespread issue.

26.    Prince George's County inspections have documented numerous violations affecting tenant health and safety, including: (a) mold growth in floors, walls, and under sinks; (b) inoperable fire safety systems; (c) missing or inadequate fire extinguishers; (d) non-functioning heating and cooling systems; and (e) structural issues including holes in walls and ceilings.

27.    Multiple tenants reported heating systems that were non-functional during the winter months, and air conditioning ("AC") systems that failed to work during the summer months. For instance, tenant Tiara Perry endured non-functioning AC for over a year despite

submitting several maintenance requests to address the issue. Tenants Tracie Caudle and Jessica Rivers also reported significant periods without a functioning AC system. Defendants failed to timely address, or otherwise ignored, these tenants' maintenance requests regarding the issue.

28.     Defendants have established a pattern of failing to properly address maintenance issues. Defendants routinely close maintenance tickets without completing repairs. Defendants send unqualified staff to address complex repairs that require licensed professionals. Defendants make temporary patches rather than permanent repairs. Defendants regularly ignore follow-up requests made by tenants, and they commonly require multiple complaints before taking any action.

29.     The uninhabitable conditions have caused documented health issues for numerous tenants, including: (a) respiratory problems requiring medical treatment; (b) skin conditions from mold exposure; (c) children experiencing asthma exacerbation; and (d) allergic reactions requiring prescription medication.

30.     The presence of black mold within the apartments at Heather Hill has significantly impacted the health and wellbeing of multiple tenants. For example: (a) the exposure to black mold within tenant Jessica Rivers's apartment has caused her to suffer severe headaches and frequent nosebleeds; (b) tenant Jerrell Shufford's family experienced health issues from a black mold infestation in their bathroom; and (c) Ms. Hall required regular nebulizer treatments and suffered blood clots due to exposure to black mold in her apartment. Furthermore, multiple children experienced asthma exacerbations due to mold exposure.

*Ms. Hall's Experience*

31.     Ms. Hall has been a tenant at Heather Hill since 2017. Her experience exemplifies the systematic neglect and uninhabitable conditions that Defendants have maintained at the property.

32.     Ms. Hall's unit has suffered from severe structural issues, including improperly installed flooring that have caused her to fall, defective interior doors, broken patio doors creating a security risk, and missing fire extinguishers on her floor despite repeated requests.

33.     Ms. Hall has experienced persistent water damage and mold issues stemming from: (a) recurring leaks through bathroom exhaust fans; (b) water bubble formations in the kitchen ceiling drywall; (c) yellow liquid seeping through bathroom ceiling; (d) water damage to closet ceilings and walls; (e) kitchen cabinets separating from walls due to water damage; (f) warped and cracking countertops from water infiltration; and (g) recurring black mold growth that Defendants merely painted over.

34.     Ms. Hall's unit has lacked essential services and appliances, including: (a) no heat since at least November 29, 2023; (b) persistent periods without hot water; (c) a non-functioning oven reported multiple times; (d) a malfunctioning refrigerator that has forced her to discard impacted groceries and endangered her insulin; (e) a defective dishwasher; (f) a leaking washing machine; and (g) non-working kitchen lights.

35.     Ms. Hall's unit has been plagued by pest infestations, including: (a) mouse infestation evidenced by mouse droppings behind appliances; (b) dead mice visible in common areas; (c) visible holes in walls allowing pest entry; and (d) Defendants' inadequate pest control response.

36.    These conditions have caused Ms. Hall and her family to suffer serious health issues, including respiratory problems, severe headaches, ear infections, chronic coughing, nasal and sinus congestion, body rashes, dizziness, and nosebleeds requiring specialized care from an Otolaryngologist.

37.    Ms. Hall's doctors have confirmed her health issues are linked to the mold in her unit, as evidenced by: (a) a March 2018 doctor's letter connecting her symptoms to black mold exposure; (b) August 14, 2022 letter from her allergy doctor regarding mold impacts; (c) ongoing medical treatment for mold-related conditions; and (d) similar symptoms experienced by her children and grandson.

38.    Despite hundreds of maintenance requests, Defendants have failed to properly address these issues. Defendants persistently ignore or delay responses to Ms. Hall's maintenance tickets. Defendants provided misleading information to Ms. Hall about the causes of certain problems, and Defendants have engaged in retaliatory conduct against Ms. Hall with baseless lease violation citations.

39.    When Defendants did respond to Ms. Hall's complaints, their actions were inadequate. Defendants painted over the black mold instead of remediating it, they refused to open walls to address the water lease, and they made superficial repairs that failed to resolve issues.

### *CLASS ACTION ALLEGATIONS*

40.    Ms. Hall brings this action pursuant to Maryland Rule 2-231 on behalf of herself and all others similarly situated, as members of the proposed class defined as all persons who have resided at Heather Hill Apartments at any time since April 2022 and paid rent or other fees to Defendants (the "Class").

41.     Numerosity: The proposed class is so numerous that joinder of all members is impracticable. Heather Hill contains 459 apartment units. Upon information and belief, the class consists of over 500 current and former tenants who have resided at Heather Hill since April 2022.

42.     Commonality: There are questions of law and fact common to the class that predominate over any questions affecting only individual members, including: (a) whether Defendants operated Heather Hill without required licensing; (b) whether Defendants collected rent during periods when they lacked legal authority to do so; (c) whether Defendants maintained Heather Hill in habitable condition; (d) whether Defendants violated the Maryland Consumer Protection Act; (e) whether Defendants violated the Maryland Consumer Debt Collection Act; (f) whether class members are entitled to damages and other relief; and (g) the proper measure of damages.

43.     Typicality: Ms. Hall's claims are typical of the claims of the class members. Ms. Hall and all class members: (a) resided at Heather Hill during Defendants' unlicensed operation; (b) paid rent and fees to Defendants; (c) experienced similar habitability issues; (d) were subjected to the same maintenance practices; and (e) suffered similar types of damages.

44.     Adequacy: Ms. Hall will fairly and adequately protect the interests of the class because she has retained experienced counsel competent in class action litigation, her interests are aligned with those of the class, she has demonstrated commitment to pursuing this action, and she has no conflicts that would interfere with class representation.

45.     Superiority: A class action is superior to other available methods for fairly and efficiently adjudicating this controversy because: (a) individual claims would be uneconomical to litigate separately; (b) individual tenants lack resources to pursue individual actions; (c) multiple

individual actions would burden the courts; (d) class treatment will provide consistent results; (e) common evidence will prove the claims.

### COUNT I
**Violation of the Maryland Consumer Protection Act against all Defendants**
**Md. Code Ann., Com. Law §§ 13-101, et seq.**

46.     Plaintiff incorporates herein the allegations set forth in paragraphs 1 through 45, above.

47.     The Maryland Consumer Protection Act prohibits unfair, deceptive, and abusive trade practices in the rental of consumer realty and collection of consumer debt. Md. Code Ann., Com. Law §§ 13-303(1), (2) and (5).

48.     Defendants are "merchants" under the CPA because they are engaged in the business of leasing consumer realty and offering consumer realty for lease. Md. Code Ann., Com. Law § 13-101(g).

49.     The apartment units at Heather Hill constitute "consumer realty" under the CPA because they are primarily for personal, family, or household purposes. Md. Code Ann., Com. Law § 13-101(d).

50.     Defendants engaged in unfair and deceptive trade practices prohibited by § 13-301 of the CPA by: (a) falsely representing that they had the legal authority to lease apartments and collect rent when they lacked required licensing; (b) falsely representing that Heather Hill apartments were of a particular standard, quality, and grade when they were not, including advertising "renovated" units that were uninhabitable; (c) failing to disclose material facts about the property's condition and their lack of required licensing; (d) representing that they would maintain the property in habitable condition when they had no intention of doing so; (e) advertising and offering apartments without intent to deliver them in the condition represented;

(f) collecting rent and fees during periods when they had no legal authority to do so; and (g) making false and misleading statements about their right to collect rent and impose late fees while operating without valid licensing.

51.     Defendants engaged in unfair trade practices by: (a) operating a large apartment complex without required licensing and inspections; (b) refusing to make necessary repairs while continuing to collect rent; (c) maintaining deplorable conditions that posed serious health and safety risks; (d) filing baseless court actions against tenants while lacking legal authority to collect rent; and (e) threatening eviction and late fees while operating without valid licensing.

52.     These unfair and deceptive practices caused substantial injury to Plaintiff and class members who: (a) paid rent and fees that Defendants had no legal right to collect; (b) lived in uninhabitable conditions; (c) suffered damage to their health and property; (d) incurred expenses for alternative housing, medical care, and replacement of damaged property; and (e) face potential eviction despite Defendants' lack of legal authority.

53.     Plaintiff and class members could not have reasonably avoided their injuries because Defendants concealed their lack of licensing and misrepresented their authority to operate Heather Hill.

54.     The injuries suffered by Plaintiff and class members are not outweighed by any countervailing benefits to consumers or competition.

55.     As a direct and proximate result of Defendants' violations of the CPA, Plaintiff and class members have suffered actual damages including: (a) payment of rent and fees during unlicensed periods; (b) costs of temporary alternative housing; (c) medical expenses; (d) damage to personal property; (e) expenses for pest control and repairs; and (f) emotional distress.

## COUNT II
**Breach of Implied Warranty of Habitability**
**and Violation of Maryland Code, Real Property § 8-211 against all Defendants**

56.    Plaintiff incorporates herein the allegations set forth in paragraphs 1 through 45, above.

57.    Under Maryland law, residential landlords impliedly warrant that rental properties are habitable and fit for human occupancy. This warranty is incorporated into every residential lease.

58.    Maryland Code, Real Property § 8-211 codifies tenants' rights to habitable premises, requiring landlords to repair conditions that constitute "serious and substantial defects" which are a "substantial and serious threat to the life, health, and safety of occupants."

59.    Prince George's County Code § 13-113(c) defines a property as "unfit for human occupancy" when it is "unsafe, unlawful, or, because of the degree to which the structure is in disrepair or lacks maintenance, is unsanitary, vermin or rat infested, contains filth and contamination, or lacks ventilation, illumination, sanitary or heating facilities, utilities, or other essential equipment."

60.    Defendants have breached the implied warranty of habitability and violated § 8-211 by failing to maintain Heather Hill in habitable condition, as evidenced by:

    (a) widespread sewage backups affecting multiple units, including raw sewage backups in tenant Juanita Caldwell's master bathroom, chronic sewage problems in tenant Kemba Colvin's sinks and tub, and sewage backups in tenant Tiara Perry's kitchen requiring wall removal.

    (b) Pervasive water damage and leaks, including water/urine leaks through tenant Darlene Johnson's bathroom ceilings since 2019, flooding in tenant Juanita Caldwell's second bedroom and kitchen, and major leaks causing mold growth in tenant Jerrell Shuford's master bathroom.

    (c) Dangerous pest infestations affecting entire buildings, including roach nests behind appliances, bat infestations in common areas and units, rodent infestations

causing property damage, and vermin entering through holes in the units that Defendants failed or otherwise refused to repair.

(d) Non-functioning essential systems, including inoperable heating and cooling systems, broken plumbing requiring resident-funded repairs, malfunctioning appliances, and failed fire safety systems.

(e) Serious health hazards, including toxic mold growth, raw sewage exposure, inadequate ventilation, and contaminated walls and ceilings.

61.    These conditions constitute serious and substantial defects that threaten tenants' health and safety, as evidenced by: (a) medical treatment required for respiratory infections, skin conditions, allergic reactions, and asthma exacerbation; (b) property damage from water infiltration, sewage backups, pest infestations, and mold growth; and (c) loss of essential services including functioning bathrooms, safe drinking water, climate control, and sanitary food storage.

62.    Defendants had actual notice of these conditions through multiple maintenance requests from tenants, direct complaints to management, notices of violation from Prince George's County, failed inspections, and documentation from contractors.

63.    Despite notice, Defendants failed to repair these conditions within a reasonable time or at all, demonstrating a pattern of: (a) ignoring maintenance requests; (b) making inadequate temporary repairs; (c) closing tickets without completing repairs; (d) refusing to address root causes of problems; and (e) failing to respond to follow-up requests.

64.    As a direct and proximate result of Defendants' wrongful conduct, Ms. Hall and class members have suffered and continue to suffer substantial harm.

## COUNT III
### Violation of the Maryland Consumer Debt Collection Act against Defendants
### Md. Code Ann., Com. Law §§ 14-201, et seq.

65.    Plaintiff incorporates herein the allegations set forth in paragraphs 1 through 45, above.

66.     The Maryland Consumer Debt Collection Act prohibits collectors from collecting or attempting to collect consumer debts that they know are not owed, engaging in unlicensed debt collection activity, and engaging in conduct that violates §§ 807 and 808 of the Fair Debt Collection Practices Act.

67.     Defendants Heather Hill Operating Company LLC and OneWall Communities LLC are "collectors" under the CDCA because they collect or attempt to collect consumer debts owed to Heather Hill Property Company LLC.

68.     The rent and fees Defendants attempted to collect constitute "consumer debts" under the CDCA.

69.     Under Maryland law, property management companies that receive rent and other payments are collection agencies within the meaning of the Maryland Collection Agency Licensing Act (MCALA). Md. Code Ann., Bus. Reg. § 7-101(d)(1).

70.     Defendants Operating Company and OneWall Communities violated the CDCA by:

(a) Collecting and attempting to collect rent and fees during periods when: (i) they lacked required debt collection licensing; (ii) they knew Heather Hill Property Company LLC lacked legal authority to collect rent due to invalid licensing; and (iii) they knew the property failed to meet basic habitability standards.

(b) Engaging in unlicensed debt collection activities, including: (i) demanding rent payments; (ii) assessing late fees; (iii) threatening eviction; (iv) filing court actions; and (v) reporting tenants to credit agencies.

(c) Using false, deceptive, and misleading representations, including: (i) claiming legal right to collect rent during unlicensed periods; (ii) misrepresenting authority to impose late fees; (iii) threatening legal action they could not legally take; and (iv) claiming rent was due when it was not legally collectible.

(d) Using unfair and unconscionable means to collect debts by: (i) filing over 130 baseless failures to pay rent actions; (ii) threatening eviction without legal authority; (iii) demanding payment for uninhabitable units; and (iv) attempting to collect through coercion and harassment.

71.     For example, on August 19, 2024, after their license was suspended, Defendants issued notices to tenants demanding rent payments, requiring payment by specific methods, threatening late fees, and implying legal authority they did not possess.

72.     Defendants knew these collection activities were unlawful because: (a) they knew they lacked required licensing; (b) they received multiple notices of violation; (c) their temporary license was suspended; (d) they were notified of habitability issues; and (e) they voluntarily dismissed over 130 rent actions when challenged.

73.     As a direct and proximate result of Defendants' violations of the CDCA, Ms. Hall and class members have suffered and continue to suffer damages.

74.     Each unlawful collection attempt constitutes a separate violation of the CDCA.

75.     Violations of the CDCA constitute per se violations of the Maryland Consumer Protection Act. Md. Code Ann., Com. Law § 13-301(14)(iii).

76.     Plaintiff suffered substantial harm due to Defendant's conduct.

## COUNT IV
### Negligence Per Se - Violation of Prince George's County Code against all Defendants

77.     Plaintiff incorporates herein the allegations set forth in paragraphs 1 through 45, above.

78.     Prince George's County Code establishes mandatory licensing and maintenance requirements for multi-family dwellings, including: (a) requiring license to offer and lease multi-family dwelling units (§ 13-181); (b) requiring written application to DPIE ensuring code compliance (§ 13-182); (c) adopting International Property Maintenance Code standards (§ 13-101(a)); and (d) establishing minimum property maintenance standards (§§ 13-119 through 13-127).

79.     These code provisions are designed to protect tenants' health and safety by ensuring that: (a) properties are properly inspected before occupancy; (b) essential systems are maintained in working order; (c) sanitary conditions are preserved; (d) fire safety measures are implemented; and (e) basic habitability standards are met.

80.     Ms. Hall and class members are within the class of persons that these code provisions were enacted to protect.

81.     Defendants violated these code provisions by operating without required licensing for over two years, including failing to apply for license within 30 days of purchase, continuing operations after temporary license was voided, and operating after license suspension. Defendants further violated these code provisions by failing to maintain minimum property standards, including inadequate premises identification (§ 13-119(a)), non-functional entry door locks (§ 13-119(c)), deteriorated paint and plaster (§ 13-120), failure to maintain pest-free conditions (§ 13-121(c)), missing directional signage (§ 13-122(a)), inoperable cooking facilities (§ 13-123(e)), and inadequate heating systems (§ 13-127(a)).

82.     Allowing conditions rendering units "unfit for human occupancy" under § 13-113(c), as evidenced by vermin infestations, lack of essential utilities, structural hazards, unsanitary conditions, and contamination.

83.     Defendants' code violations are evidenced by multiple notices of violation from DPIE, including Notice HOU-16446 (April 11, 2024), Notice HOU-15393 (March 13, 2024), Notice HOU-14764 (February 29, 2024), Notice HOU-6068 (October 6, 2023), Notice HOU-7618 (November 28, 2023), and Notice HOU-7765 (December 1, 2023). Defendants' code violations are further evidenced by failed inspections documenting fire code violations, plumbing failures, electrical hazards, structural defects, and health code violations.

84.    These violations directly caused injuries to Plaintiff and class members including:
(a) living in dangerous and unsanitary conditions; (b) exposure to health hazards; (c) loss of use
of essential facilities d. Damage to personal property; (e) medical expenses; and alternative
housing costs.

85.    Defendants' violations constitute negligence per se because: (a) they violated
statutes designed to protect public safety; (b) the violations caused the type of harm the statutes
aimed to prevent; (c) Ms. Hall and class members were within the protected class; and (d) the
violations directly caused their injuries.

**COUNT V**
**Breach of Contract and Constructive Eviction against all Defendants**

86.    Plaintiff incorporates herein the allegations set forth in paragraphs 1 through 45,
above.

87.    Valid and binding lease agreements existed between Defendants and Ms. Hall and
class members.

88.    Under Maryland law, every residential lease contains an implied covenant of quiet
enjoyment and implied warranty of habitability.

89.    Section 13-162 of the Prince George's County Code requires residential leases to
contain: (a) an express warranty of habitability; (b) a non-retaliation provision; and (c) an
acknowledgment of rent escrow remedy.

90.    Defendants materially breached these lease agreements by:

(a) failing to include required provisions in leases omitting express warranty of
habitability, omitting non-retaliation provisions, and omitting rent escrow
acknowledgments.

(b) Failing to maintain premises in habitable condition by allowing chronic sewage
backups, failing to repair water leaks, permitting dangerous pest infestations, not
maintaining essential systems, and ignoring structural hazards.

    (c) Violating express lease terms regarding maintenance obligations, timely repairs, pest control, utilities, and safety measures.

    (d) Breaching implied covenants by rendering units uninhabitable, interfering with quiet enjoyment, failing to make repairs, collecting rent without legal authority, and retaliating against complainants.

Attached hereto as Exhibit 1 is a true and correct copy of the lease agreement that Ms. Hall and Defendants ultimately executed on or about January 4, 2023. Upon information and belief, the lease agreement contains the same or substantially similar terms and conditions as those lease agreements between Defendants and the class members.

    91.    These breaches are evidenced by: (a) tenant Juanita Caldwell's experience multiple sewage backups, flooding issues, roach infestation, non-working appliances, and forced relocation to equally uninhabitable unit; (b) tenant Kemba Colvin's chronic plumbing failures, sewage odor issues, unaddressed pest problems, HVAC issues, and ignored maintenance requests; (c) tenant Darlene Johnson's experience with water leaks since 2019, risk of ceiling collapse, bat infestations, and black mold.

    92.    Defendants' breaches have rendered units uninhabitable and constructively evicted tenants by creating dangerous living conditions, failing to provide essential services, rendering units unusable for their intended purpose, forcing tenants to seek alternative housing, and causing health hazards.

    93.    Defendants' breaches were knowing and willful, as demonstrated by systematic failure to make repairs, a pattern of ignoring maintenance requests, continued collection of rent for uninhabitable units, operation without required licensing, and retaliatory actions against complaining tenants.

94.     As a direct result of these breaches, Ms. Hall and the class members have suffered and continue to suffer substantial harm.

**COUNT VI**
**Alternative Theory: Unjust Enrichment against all Defendants**

95.     Plaintiff incorporates herein the allegations set forth in paragraphs 1 through 45, above.

96.     Ms. Hall pleads this count in the alternative to her breach of contract claim.

97.     Defendants have been unjustly enriched by collecting rent and fees during periods when: (a) they lacked legal authority to operate Heather Hill; (b) they had no valid rental license; (c) their temporary license was void or suspended; and (d) units were uninhabitable.

98.     Defendants have been unjustly enriched by retaining security deposits while: (a) operating without the required license; (b) maintaining uninhabitable conditions; (c) failing to make necessary repairs; and (d) violating lease terms.

99.     Defendants have been unjustly enriched by charging tenants fees for: (a) non-functioning amenities; (b) inoperable appliances; (c) unusable facilities; and (d) services not provided.

100.    From April 2022 through present, Defendants have collected and retained substantial sums including monthly rent payments from approximately 459 units, security deposits, late fees, utility charges, amenity fees, and other charges characterized as "additional rent."

101.    These payments conferred a benefit on Defendants, as evidenced by regular rent collection practices, bank deposits, accounting records, lease payment histories, and collection notices to tenants.

102.    Defendants knew they were receiving these benefits while operating without required licensing, violating housing codes, maintaining uninhabitable conditions, failing to provide contracted services, and lacking legal authority to collect rent.

103.    It would be inequitable for Defendants to retain these benefits because: (a) they had no legal right to collect rent while unlicensed; (b) they failed to provide habitable housing in exchange; (c) they violated multiple laws and regulations; (d) they misrepresented their legal authority; and (e) they knew conditions were uninhabitable.

104.    The inequitable nature of Defendants' conduct is demonstrated by continuing to demand rent after their license was suspended, filing over 130 illegal failure to pay rent actions, threatening eviction without legal authority, refusing to make necessary repairs while collecting rent, and retaliating against tenants who complained.

105.    As a result of Defendants' wrongful conduct, Ms. Hall and class members are entitled to restitution of all or a portion of the rent paid during unlicensed periods, security deposits, late fees, other fees and charges, and interest on these amounts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Charlene Hall, individually and on behalf of the Class, respectfully request that the Court enter judgment on the Complaint, in her favor and against Defendants Heather Hill Property Company LLC, Heather Hill Operating Company LLC, OneWall Communities LLC, as follows:

A.    Declare that: (1) Defendants' operation of Heather Hill without valid licensing was unlawful; (2) Defendants had no legal authority to collect rent during unlicensed periods; (3) Defendants' lease agreements violated Maryland law; and (4) Defendants' debt collection practices violated the CDCA.

B.     Award Ms. Hall and the Class compensatory damages for the harm they suffered

as a result of Defendants' conduct, in fair and reasonable amount to be determined at trial;

C.     Award Ms. Hall and the Class punitive damages against Defendants, in an amount

that sufficiently punishes, penalizes, and/or deters Defendants' unlawful conduct;

D.     Award Ms. Hall and the Class pre-judgment interest and post-judgment interest;

E.     Award Ms. Hall and the Class the costs and fees they incurred in connection with

this action, including reasonable attorneys' fees;

F.     Enter a permanent injunction against Defendants, requiring that they:

> (1) Immediately cease: (i) operating without valid licensing; (ii) collecting rent until
> properly licensed; (iii) threatening eviction or legal action; and (iv) engaging in
> unlicensed debt collection.

> (2) Complete within 30 days: (i) professional mold inspection and remediation in all
> units; (ii) comprehensive pest control treatment; (iii) repair of all plumbing
> systems causing sewage backups; (iv) installation of functioning fire safety
> equipment; and (v) repair of all non-functioning HVAC systems.

> (3) Implement and maintain: (i) a 24-hour emergency maintenance response system;
> (ii) regular property inspections; (iii) documentation of all maintenance requests
> and responses; (iv) professional property management practices; and (v) a
> compliance monitoring system.

> (4) Provide to all tenants: (i) written notice of their rights under Maryland law; (ii)
> access to maintenance records; (iii) documentation of licensing status; (iv) regular
> updates on repair progress; and (v) clear procedures for reporting issues.

> (5) Submit to the Court or a third-party designated by the Court: (i) monthly
> compliance reports; (ii) independent property inspections; (iii) regular status
> conferences; (iv) tenant feedback mechanism; and (v) financial audits of rent
> collection practices.

G.     Appoint a Receiver if necessary to take control of Heather Hill's operations,

collect and manage rents, make the necessary repairs, ensure code compliance, and protect

tenants' interests.

H.     Order Defendants to: (1) establish an escrow fund for repairs; (2) maintain separate accounting of all rent collected; (3) provide monthly financial reports to counsel for Ms. Hall; (4) fund relocation assistance for displaced tenants; and (5) reimburse tenants' alternative housing costs for those tenants who have been impacted due to Defendants' wrongful conduct.

I.     Require Defendants to: (1) obtain and maintain all required rental licensing, property insurance, performance bonds, debt collecting licensing, and professional certifications; and (2) submit to ongoing monitoring of maintenance practices, rent collection procedures, leasing practices, housing code compliance, and financial operations.

J.     Grant Ms. Hall and the Class such other relief as the Court deems just and proper, including additional injunctive and declaratory relief as may be required in the interest of justice.

Dated: December 13, 2024

*/s/ Jordan D. Howlette*
JORDAN D. HOWLETTE
MD AIS No.: 2006110003
JD Howlette Law | Justly Prudent
1140 3rd St. NE
Washington, DC 20002
Tel: (202) 921-6005
Fax: (202) 921-7102
jordan@jdhowlettelaw.com
*Counsel for Plaintiff*

E-FILED; Prince George's Circuit Court
Docket: 12/13/2024 5:11 PM; Submission: 12/13/2024 5:11 PM
Envelope: 19184235

# EXHIBIT 1

Heather Hill by OneWall



## LEASE CONTRACT
CERTIFIED LEASE ☑ MARYLAND

| PARTIES AND LEASED PREMISES | | |
|---|---|---|
| **Owner**<br>Heather Hill Property Company LLC | **Address** | **Phone** |
| **Residential Community**<br>Heather Hill by OneWall | | |

| **Street Address**<br>5837 Fisher Rd | **City**<br>Temple Hills | **State**<br>Maryland | **ZIP**<br>20748-5901 |
|---|---|---|---|
| **Residents**<br>Antwon Hall, DEANDRE HALL, and Charlene Hall* | | | **Leased Premises**<br>5803 -011 |
| **Street Address**<br>5803 Fisher Road #011 | **City**<br>Temple Hills | **State**<br>Maryland | **ZIP**<br>20748 |

| LEASE TERM | | | | |
|---|---|---|---|---|
| **Type**<br>☒ Move-In  ☐ Renewal | **Length**<br>1 year | **Start Date**<br>4/1/2023 | **End Date**<br>3/31/2024 | **Date Signed**<br>June 9, 2023 |

| RENT | | |
|---|---|---|
| **Payable To**<br>Heather Hill Operating Company LLC | **Address**<br>5837 Fisher Rd, Temple Hills, MD  20748-5901 | **Phone**<br>(301) 894-8524 |

| **Office Hours**<br>Mon-Fri: 8:30am - 5:30pm Sat: 10am - 4pm | **Due On**<br>1st | **Late On**<br>10th | **Fax**<br>(    )    - |
|---|---|---|---|

| CHARGES | | | | | |
|---|---|---|---|---|---|
| Lock Change Charge | $75.00 | Lease Buy-Out | $1,952.00 | Key Replacement Charge | $25.00 |
| Dishonored Payment | $35.00 | Late Payment* | See Below | Smoke/CO Alarm Tampering Charge | $75.00 |
| Failure to Clean Garbage Charge | $75.00 | Window Screen Replacement | $25.00 | | |
| *Pursuant to Maryland Code 8-208(d)(3), late payment fee shall not exceed 5% of the rent due.* | | | | | |

| TOTAL MOVE-IN COSTS | | | | | |
|---|---|---|---|---|---|
| Total Monthly Payment | $1,952.00 | Total Deposits | $99.00 | Total One-Time Fees | $0.00 |
| **TOTAL DUE ON OR BEFORE MOVE-IN** | | | | | **$2,051.00** |

| MONTHLY PAYMENTS | | DEPOSITS | | ONE-TIME FEES | |
|---|---|---|---|---|---|
| Base Rent | $1,952.00 | Security Deposit | $99.00 | Application Fee(s)<br>Paid $0.00 | $0.00 |
| **TOTAL MONTHLY PAYMENT** | $1,952.00 | **TOTAL DEPOSIT** | $99.00 | **TOTAL ONE-TIME FEES** | $0.00 |

THIS RESIDENTIAL LEASE CONTRACT (this "Agreement") is made and entered into as of the **9th** day of **June**, **2023**, by and between Owner of Residential Community ("Owner") and **Antwon Hall, DEANDRE HALL, and Charlene Hall***, jointly and severally (hereinafter collectively "Residents"). Owner hereby leases to Residents the premises at **5803 Fisher Road #011, Temple Hills, MD  20748** (the "Leased Premises"), located within **Heather Hill by OneWall** (the "Residential Community"), for use exclusively as a private residence, and not for any other purpose. The Leased Premises may also include the rental of parking, storage and garage spaces, if applicable, which will be designated and included in a separate written agreement. Any third party guarantee agreements will be included with and attached to this Agreement. Owner's representatives, agents, affiliates, successors, assigns, employees, officers, and directors are hereby incorporated by reference to benefit from any and all waivers, releases, and limitations of liability made by Residents hereunder.

1.  **OCCUPANCY OF THE LEASED PREMISES.**    **The Leased Premises may be occupied solely by Residents and Occupants, if any, listed in this Agreement** If any person other than the Residents or Occupants occupies the Leased

Residential Lease Contract - Maryland, Certified Docs™ - Rev. 9/2022



Heather Hill by OneWall

Premises for more than **fourteen (14)** consecutive days, or **twenty-eight (28)** total days in any **twelve (12)** month period, such person shall be deemed to reside in the Leased Premises in violation of this Agreement. Residents acknowledge that allowing unauthorized occupants to reside in the Leased Premises shall be deemed a material and incurable breach of this Agreement, and shall entitle Owner to serve Residents with a notice terminating the tenancy in accordance with applicable law.

All changes in occupancy require Owner's prior written consent, which consent may be withheld in Owner's sole discretion. If Owner consents to an occupancy change during the term of this Agreement, a new Residential Lease Contract or an amendment to this Agreement must be executed. Any assignment or subletting without Owner's prior written consent shall be void and may, at Owner's sole discretion, terminate this Agreement. Owner's acceptance of rent from any person not identified as a Resident or an authorized occupant shall be deemed to be the payment of rent on behalf of Residents and shall not constitute Owner's consent for said person to occupy or reside in the Leased Premises.

2. **TERM.**    This Agreement shall be for a fixed lease term of **1 year**. The initial term ("Initial Term") of this Agreement shall begin on **April 1, 2023** and end at **11:59pm** on **March 31, 2024**. Thereafter, this Agreement will automatically renew for successive month to month terms (each, a "Renewal Term") unless either party provides written notice that it will not renew at least **sixty (60)** days prior to the expiration of the Initial Term or the parties execute a new Residential Lease Contract. . In the event of a month-to-month tenancy, either party must give at least one (1) month advance written notice of termination or intent to vacate as provided in Maryland Code 8-402(b)(3).

   Initial: _____  _____  _____

3. **SECURITY DEPOSIT.**    Residents have deposited with Owner the sum of **$99.00**, the receipt of which is hereby acknowledged as a security deposit. The retention of the security deposit shall not limit Owner's right to proceed against Residents for claims and damages exceeding the amount of the security deposit.

   ### 3.1. Notice of Resident's rights pursuant to Maryland Code 8-203.

   1. The security deposit or any portion of it may be withheld for unpaid rent, damage due to breach of this Agreement or for damage by Residents, or Residents' occupants or guests, in excess of ordinary wear and tear to the Leased Premises, common areas, major appliances, and furnishings supplied by Owner.

   2. Residents have the right to be present when Owner inspects the Leased Premises in order to determine if any damage was done to the Leased Premises, if Residents notify Owner by certified mail of Residents' intention to move, the date of moving, and Residents' new address.

   3. Residents' notice requesting a move-out inspection in Owner's presence must be furnished to Owner by mail at least fifteen (15) days prior to the date Residents move.

   4. Upon receipt of Residents' notice to move, Owner will notify Residents by certified mail of the time and date the Leased Premises are to be inspected.

   5. The date of inspection will take place within five (5) days before or five (5) days after the date of moving that is designated in Residents' notice.

   6. Failure by Owner to comply with this requirement forfeits Owner's right to withhold any part of the security deposit for damages.

   7. The security deposit is not liquidated damages and may not be forfeited to Owner for breach of this Agreement, except in the amount to cover damages suffered by Owner as a result of Residents' breach.

   8. In calculating the damages for lost future rent, any rent received during the remainder, if any, of the lease term, will reduce the damages Residents owe Owner by a like amount.

   **Under Maryland Code 8-203.1 this Agreement also constitutes Residents' receipt for payment of the security deposit. Owner acknowledges receipt of the security deposit in the amount of $99.00. Residents acknowledge receipt of the security deposit receipt. Residents have the following rights regarding the security deposit:**

   1. Residents have the right to have the Leased Premises inspected by Owner in Residents' presence for the purpose of making a written list of damages that exist at the beginning of the tenancy if Residents request an inspection by certified mail within fifteen (15) days of Residents' occupancy (the date Residents move in);

   2. Residents have the right to be present when Owner inspects the Leased Premises at the end of the tenancy in order to determine if any damage was done to the Leased Premises if Residents notify Owner by certified mail at least fifteen (15) days prior to the date of Residents' intended move, of Residents' intention to move, the date of moving, and Residents' new address;

   3. Owner is obligated to conduct the move-out inspection within five (5) days before or after Residents' stated date of intended moving;

   4. Owner is obligated to notify Residents in writing of the time and date of the inspection;

   5. Residents have the right to receive, by first class mail, delivered to Residents' last known address, a written list of the





Heather Hill by OneWall

charges against the security deposit claimed by Owner and the actual costs, within forty-five (45) days after the termination of the tenancy;

6.  Owner is obligated to return any unused portion of the security deposit, by first class mail, addressed to Residents' last known address within forty-five (45) days after the termination of Residents' tenancy; and

7.  Owner's failure to comply with the security deposit law may result in Owner being liable to Residents for a penalty of up to three (3) times the security deposit withheld, plus reasonable attorney's fees.

8.  Owner will retain a copy of this receipt for a period of two (2) years after the termination of Residents' tenancy, abandonment of the Leased Premises, or Residents' eviction, as the case may be.

9.  Owner will be liable to Residents in the sum of $25.00 if Owner fails to provide Residents a written receipt for the security deposit.

4.  **RENT.**     Residents agree to pay to Owner, as rent for the Leased Premises, the sum of **$1,952.00** per month. If Residents' tenancy initially commences after the first (1st) day of the month, Residents agree to pay **$1,952.00**, due **April 1, 2023**, as prorated rent for the first partial month. Except as otherwise provided by law, rent shall be paid in full and received on or before the **1st** day of each month in the form of **cashier's check, money order, online credit card (fees will apply for credit card transactions)** without demand. Rent and all other sums due to Owner will be payable to **Heather Hill Operating Company LLC, 5837 Fisher Rd, Temple Hills, MD 20748-5901, (301) 894-8524.** The usual days and hours when payments may be made personally are: **Mon-Fri: 8:30am - 5:30pm Sat: 10am - 4pm, 5837 Fisher Rd, Temple Hills, MD 20748-5901.** Payments made will not be held at the request of anyone - all payments made will be directly deposited. It is Residents' responsibility to be certain that each payment is received by Owner on or before its due date. Use of a rental payment drop box, if one is provided by Owner, is for Residents' convenience – the risk of receipt of funds by Owner when such box is used is Residents' risk, and not Owner's risk. Residents agree to pay any processing or convenience fees if Resident chooses to pay the rent or other charges by credit card or other methods that require additional fees.

If, in any month, rent is not paid before the **10th** day of the month, payment must be in the form of **cashier's check or money order**. If Owner serves Residents with a notice to pay rent or surrender possession in accordance with applicable law, which Owner may do on any date after the **1st** day of the month, any payment tendered following service of said notice must be in the form of **cashier's check or money order**.

   **4.1.  First Payment.**     Residents shall pay the first month's rent on or before the Initial Term begins. Payment shall be in the form of **cashier's check or money order**. In the event that Residents fail to pay the first month's rent, Owner may terminate this Agreement after sending notice as required by applicable law, and shall be entitled to recover all damages suffered, including any future rent as it becomes due and other amounts subject to any mitigation of Owner's loss.

5.  **LATE PAYMENTS AND FEES.**     Owner and Residents agree that it is and will be impracticable and extremely difficult to fix the actual damages suffered by Owner in the event Residents make a late payment of rent, or in the event Residents make a payment that is subsequently dishonored by the bank, and that the below charges represent a reasonable approximation of the damages that Owner is likely to suffer from a late or dishonored payment. Owner and Residents further agree that this provision does not establish a grace period for the payment of rent, and that Owner may give Residents a written notice to pay or quit the Leased Premises in accordance with state and local law, at any time after the payment is due. Owner shall have all remedies under the law and this Agreement in the event Residents fail to timely pay the rent or other amounts owed. At Owner's sole discretion, Owner may report any delinquent rent or other amounts owed to a credit reporting agency.

   **5.1.  Late Payments.**     Residents shall pay the total amount of rent owed on or before the **1st** day of the month. If Residents fail to timely pay all rent, Owner is entitled to a maximum late fee of **$46.00** on the **10th** day of the month. Pursuant to Maryland Code 8-208(d)(3), late payment fee shall not exceed 5% of the rent due.

   **5.2.  Dishonored Payments.**     Residents shall owe **$35.00** for each dishonored payment, plus any applicable late fees described in this Agreement, until all amounts owed are paid. Residents must resolve dishonored payments caused as a result of bank error with the bank. Owner is unable to waive the charge for dishonored payments or any late fees. In the event of a dishonored payment, Residents may, at Owner's option, be required to pay the rent and applicable late charges by **cashier's check or money order**. If **two (2)** or more payments submitted by Residents are, for any reason whatsoever, dishonored by the financial institution upon which it is drawn in any **twelve (12)** month period, Residents shall be required to pay all future rent and other charges by **cashier's check or money order** plus any and all costs required in the collection of said payments.

6.  **PAYMENTS.**     To the extent allowed by law, Owner first may apply payments received to any unpaid amounts other than rent, irrespective of any written or verbal requests by the Residents or when the charges may have accrued.

7.  **RENT INCREASES AND LEASE CONTRACT CHANGES.**     Owner may notify Residents in writing of any increase in



rent at least ninety (90) days before the rent increase shall take effect or such other period as may be required by applicable law. The new rent amount shall take effect on the date stated in the notice and after the then current lease term expires. Owner may deliver the notice of an increase in rent via email or other electronic messaging service. Residents are not required to sign the written notice of rent increase or other documents for the new rent amount to take effect.

Initial: _____   _____   _____

8.  **COMPLIANCE WITH RULES, LAWS, AND REGULATIONS.**    Residents hereby acknowledge receipt of a copy of the Residential Community's Policies and Rules (the "Rules"), which are incorporated into and made a part of this Agreement. Residents agree to abide by said Rules in all respects. Owner may make reasonable changes to the Rules upon sending thirty (30) days written notice to Residents, and Residents agree to abide by such changes, if they are distributed and applicable to the Residential Community and do not change the rent. Failure to comply with the Rules shall be deemed a breach of this Agreement.

Residents agree not to harass, annoy, or endanger any other resident or person, or create or maintain a nuisance, or disturb the peace or solitude of any other resident, or commit waste in or about the Leased Premises. Residents are responsible for the conduct of any members of their household, occupants, guests or invitees while present at the Residential Community. Residents further agree not to harass, verbally abuse, denigrate, or otherwise disrespect Owner's employees, agents, and/or contractors or interfere with Owner's business operations. Failure to abide by this policy is a breach of this Agreement and may result in the termination of Residents' right to occupy the Premises in accordance with applicable law.

Certain acts are considered to be contrary to the safety, well-being, peace, and enjoyment of the other residents of the Residential Community, and therefore, will be considered to be a breach of this Agreement. These include, but are not limited to: 1) violations of this Agreement, the Rules, or applicable fire, safety, health, or criminal laws, ordinances, or regulations, regardless of whether or where arrest or conviction occurs; 2) Residents or occupants giving incorrect or false answers in a rental application; 3) Residents or any occupants being arrested, charged, detained, convicted, or given deferred adjudication or pretrial diversion for an offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, or drug paraphernalia in violation of applicable law, or any sex-related crime, including a misdemeanor; and 4) any illegal drugs or paraphernalia are found in the Leased Premises.

Residents shall comply with all obligations imposed by all applicable laws, and all applicable building and zoning codes that are materially applicable to health and safety, and shall keep the Leased Premises, including plumbing and other fixtures, appliances, and facilities in good, clean, safe, and sanitary condition. Residents shall use in a reasonable manner all electrical, plumbing, sanitary, heating, ventilating, air conditioning, and other fixtures, appliances, and facilities in the Leased Premises and shall maintain the utility services paid for by Residents on at all times during the Initial Term and Renewal Terms. Residents shall be responsible for any and all damages caused by Residents' failure to satisfy the requirements of this Section.

9.  **MULTIPLE RESIDENTS OR OCCUPANTS.**    Residents will be in material breach of this Agreement if any Resident, Occupant, or guest (whether invited or uninvited) violates any of the terms of this Agreement or the Rules. Residents are jointly and severally liable for all obligations arising under this Agreement whether or not they remain in actual possession of the Leased Premises. Notices or demands from Owner that are served upon any Resident, Occupant, or guest are deemed validly served upon all Residents. Each Resident agrees and is deemed to be an agent for service of process for all other Residents in eviction proceedings.

    **9.1.  Replacements and Subletting.**    Without the prior written approval of Owner, which approval may be withheld in Owner's sole discretion, replacing Residents or subletting the Leased Premises is strictly prohibited. Any replacements or sublessees will be subject to Owner's policies and underwriting requirements, reimbursement of Owner's expenses in connection with the replacement or sublease, and final approval by Owner of the Residents' replacement or sublessee. Residents who are replaced or who sublet the Leased Premises will continue to be liable for all of Residents' obligations of this Agreement. Replaced Residents and sublessors relinquish their right to possess or otherwise occupy the Leased Premises. Any attempt to replace any Residents or sublet the Leased Premises without Owner's prior written consent will be void. Residents shall not assign this Agreement.

10.  **USE OF LEASED PREMISES AND COMMON AREAS.**    Residents shall not do or permit anything to be done in or about the Leased Premises that will in any way obstruct or interfere with the rights of other tenants or occupants of the building or injure or annoy them or use or allow the Leased Premises to be used for any improper, unlawful, or objectionable purpose. Further, Residents shall not cause, maintain, or permit any nuisance, in, on, or about the Leased Premises, or commit any waste in or on the Leased Premises, and shall promptly notify Owner in writing of any defective, or potentially defective conditions, in the Leased Premises, or in the Residential Community. Finally, Residents shall not put the Leased Premises to any use that violates local zoning ordinances or any other law applicable to the Leased



Heather Hill by OneWall

Premises. Residents agree to reimburse and indemnify Owner for all fines or other penalties incurred by Owner as a result of the violation of any statute, ordinance, regulation, or other governmental restriction by Residents or any members of their household, Occupants, guests, or invitees. Nothing set forth herein shall be deemed as disallowing any use of the Leased Premises that cannot legally be prohibited.

Residents further agree to the following: 1) Residents must keep the Leased Premises and areas reserved for private use clean and sanitary; 2) trash must be disposed of at least weekly in appropriate receptacles; 3) passageways may be used only for entry or exit; 4) amenity areas must be used with care and in accordance with the Rules and posted signs; 5) glass is prohibited in all common areas; 6) conducting business of any kind in the Leased Premises or the Residential Community is prohibited without Owner's prior written consent--any lawful business conducted at home by computer, mail, or telephone is permissible if permitted by local zoning ordinance and customers, clients, patients, or other business associates do not come to the Leased Premises for business purposes; 7) businesses allowed in a home by state or local statute or ordinance will be permitted with proper licensing and notification provided to Owner in advance of the operation of the business; 8) Owner may exclude from the Residential Community guests or others, who, in Owner's judgment, have been violating the law, violating this Agreement or violating any community rules, which includes anyone who is disturbing other residents, neighbors, visitors, or Owner's representatives; 9) Owner may also exclude from any outside area or common area anyone who refuses to show identification or identify themselves as a guest, occupant or resident in the Residential Community; and 10) Residents agree to notify Owner if Residents or any occupants are convicted of a felony, offense involving a controlled substance, violence to another or destruction of property, or if any of the above register as a sex offender in any state. Any violation of these provisions shall be deemed a material and incurable breach of this Agreement and shall entitle Owner to serve Residents with notice terminating the tenancy in accordance with applicable law.

11. **LEASED PREMISES AND FURNISHINGS.**    Residents have the right to have the Leased Premises inspected by Owner in Residents' presence for the purpose of making a written list of damages that exist at the beginning of the tenancy if Residents request and inspection by certified mail with fifteen (15) days of Residents' occupancy (the date Residents move in) (the "Joint Inspection"). In the event Residents do not timely elect such right, Residents acknowledge and agree that Residents have inspected the Leased Premises. Residents acknowledge that the Leased Premises are in a clean, fit, and habitable condition including painted surfaces, carpets, flooring, all furniture, furnishings, fixtures, equipment and appliances. It shall be conclusively presumed that said Leased Premises and all items, appliances and fixtures contained therein are in good working condition, unless any damages are discovered during the Joint Inspection or Residents deliver a contrary statement in writing to Owner prior to or on the starting date of this Agreement. Residents agree to diligently maintain the Leased Premises, be responsible for the proper care of any and all furniture, furnishings, fixtures, appliances and equipment therein, and to keep the Leased Premises in a neat and clean condition. Residents promise to return the Leased Premises and all furniture, furnishings, fixtures, equipment and appliances to Owner in the same condition at the time Residents vacate the Leased Premises as when first rented, less ordinary wear and tear. Residents further acknowledge that the smoke detector and/or carbon monoxide detector is operable and it is the responsibility of Residents to maintain the smoke detector and/or carbon monoxide detector in accordance with state and local law, and the manufacturer's recommendations. Residents must promptly report non-functional smoke and/or carbon monoxide alarms to Owner so repairs can be made. The Leased Premises will be furnished with the following items: **Refrigerator, Stove, Dishwasher (in select units), Garbage Disposal**.

All appliances are installed per manufacturers' specifications and may be anchored. Residents shall not move, un-hook, or relocate any appliance connected to a gas/water source or floor drain connection at any time. Residents agree to promptly notify in writing (service request form) or by electronic notification to Owner of any defects, dilapidations, dangerous conditions, or other needed repairs as said conditions become evident. Residents agree to immediately reimburse Owner for any sums incurred by Owner to repair the Leased Premises, as permitted by applicable law, or any item, fixture, appliance or appurtenance damaged by the misuse or neglect of Residents or any members of their household, Occupants, guests, or invitees. This Agreement may not be terminated due to interruption of any service, including necessary repairs, beyond the control of Owner, unless otherwise required by law.

11.1. **Smoke Detectors.**    Owner certifies that smoke detectors have been installed and are in proper working condition in accordance with applicable law prior to Residents' occupancy. Residents must pay for and replace batteries as needed, unless the law provides otherwise. Upon entering the Leased Premises in accordance with applicable law, Owner may replace batteries at Residents' expense. Owner must repair, maintain, replace smoke detectors within the Leased Premises in accordance with applicable law. Residents must immediately report smoke detector malfunctions to Owner. Neither Residents, occupants, or their guests, may disable the smoke detectors. Residents will be liable for any actual damages that result from Residents' failure to report any malfunctions of smoke detectors to Owner. Residents will also be liable for any fines and penalties for the failure to comply with state law, unless such compliance is Owner's obligation under applicable law. The Leased Premises is furnished with battery powered smoke detector(s). Owner will provide working batteries when Residents take possession of the Leased Premises. Unless provided otherwise by law, Residents must pay for and replace batteries as needed during the lease term. Upon entering the Leased Premises in




Heather Hill by OneWall

accordance with applicable law, Owner may replace dead or missing batteries at Residents' expense.

**11.2.  Freezing Weather Conditions.**      For the purpose of preventing broken pipes and other damages, Residents agree that, for the duration of any freezing weather conditions, Residents will maintain the temperature of the Leased Premises at least **fifty-five (55)** degrees Fahrenheit, leave all closet and cupboard doors open (which allows more heat to reach pipes), and set all water faucets to drip. Residents will be liable for any damages that result from Residents' failure to perform the responsibilities listed in this Section.

**11.3.  Casualty Loss.**      Unless otherwise required by law, Owner is not liable to Residents, Occupants, or guests for personal injury or damages to or loss of personal property for any cause outside of Owner's control, including but not limited to: acts God, fire, smoke, flood, rain, pipe leaks, ice, hail, snow, lightning, wind, earthquakes theft, vandalism, or utility interruptions. If the Leased Premises is damages by fire or other casualty, Residents shall immediately notify Owner. If Owner determines, in its sole discretion, that the Leased Premises is not damaged to the extent that the Leased Premises is rendered untenantable, Owner shall repair the Leased Premises within a reasonable period of time after Owner's receipt of such notice from Residents, and no rent shall abate. If Owner determines that the Leased Premises has been damaged due to fire or other casualty to the extent that the Leased Premises is substantially damaged and rendered untenantable, shall terminate Residents' right to occupy the Leased Premises, in accordance with applicable law. After such termination, Owner shall return the security deposit, less any deductions as provided in this Agreement, and any prepaid rent to Residents in accordance with applicable law. Notwithstanding the foregoing, in the event Owner reasonably believes that Residents, Occupants, or guests or invitees of Residents or Occupants were the cause of such casualty, Owner shall notify Residents that the security deposit and any prepaid rent shall be held until a determination is made with respect to the amount of damages caused by the acts of Resident, Occupants, or guests or invitees of Residents or Occupants. Owner shall have the right to apply the security deposit and any prepaid rent to any such damage.

**11.4.  Crime or Emergency.**      In the event of a crime or emergency, call 911, then contact Owner or Owner's representative. Owner makes no warranties or guarantees, express or implied, concerning security measures implemented by Owner. All warranties and guarantees not specified in this Agreement are expressly disclaimed. Unless otherwise provided by law, Owner is not liable to Residents or any Occupants, visitors, or guests for injury, damage, or loss to person or property caused by criminal conduct of other persons, including theft, burglary, assault, vandalism, or other crimes. Owner is not required to obtain a criminal history report on any residents, occupants, guests, visitors, or contractors to the housing community. Residents, Occupants, or guests affected by crime must make a written report and deliver it to Owner or Owner's representative and the appropriate law enforcement agency. Upon request, Residents must provide Owner with any law enforcement agency's report related to Residents' tenancy or the housing community.

12.  **UTILITIES.**      Owner agrees, at Owner's expense, to furnish the following utilities to the Leased Premises: **N/A**. Residents agree to pay all charges (including utility deposits) not supplied by Owner, assessed by the utility provider (or Owner, or Owner's designated billing party) in connection with Residents' use of utilities during the term of this Agreement, or the period of occupancy by the Residents, whichever is longer. Residents agree to pay the utility bills for which they are responsible and to ensure that utilities remain connected for the duration of the Initial Term or any renewal period. Residents will be in default of this Agreement if utilities are disconnected prior to the expiration of this Agreement. Residents acknowledge and agree that utilities provided under this Agreement are for normal household use and must not be wasted. Residents shall properly use all electrical, gas and plumbing fixtures and appliances only for their intended purposes. Residents shall not install or operate any additional equipment or appliance, including, but not limited to, portable generators, additional refrigerators and freezers, a dishwasher, washing machine, clothes dryer, or an air conditioning unit in the Leased Premises unless supplied by Owner or with Owner's prior written approval.

Provided Owner provides Residents notice, as required under applicable law, if any, Owner may modify the method by which the utilities are furnished to the Leased Premises or billed to Residents during the term of this Agreement. In the event of interruption or failure of utility services that Owner is required to furnish, Owner shall use reasonable diligence in its efforts to restore such services. Except as required by applicable law, Owner shall not be liable for any damages directly or proximally caused by interruption or failure of utility service unless such interruption or failure of utility service is solely due to Owner's failure to pay to the service provider for the provision of such services to the Leased Premises or due to Owner's willful acts.

Owner reserves the right, in accordance with applicable law, at any time when a past due balance is owing on the utilities, to apply any and all funds received from the Residents, including funds paid as rent, first to the past due balance and then any remaining funds will be applied to Rent. Residents agree to this allocation of funds despite any limiting or restrictive endorsement contained on the payment. Further, if Residents fail to pay any utility charges that are to be paid by Residents, Owner may, at its option, pay such charges in full to retain continuing utility services and bill Residents such charges as additional rent, together with the regular monthly rental payment on the **1st** day of the month next following the date of such billing. When the Residents move from the Leased Premises, the utility charges will be charged to and deducted from the security deposit in accordance with applicable law. It is understood and agreed between Owner

Residential Lease Contract - Maryland, Certified Docs™ - Rev. 9/2022



Heather Hill by OneWall

and Residents that in the event submetered or allocation payments are not made when due, it shall be considered a default under this Agreement.

13. **DAMAGES, ALTERATIONS AND REPAIRS.**    Residents agree not to destroy, damage, deface or remove any part of the Leased Premises or Residential Community or permit any persons or animals to do so and to assume all liability for damages other than ordinary wear and tear and any damages that are Owner's obligation to repair under applicable law. Residents shall make no alterations to the Leased Premises without the prior written consent of Owner. Any alteration made to the Leased Premises by Residents after that consent has been given, and any fixtures installed as a part of that work, will at Owner's option, become Owner's property on the expiration or earlier termination of Residents' right to occupy the Leased Premises, provided, however, that Owner shall have the right to require Residents to remove any fixtures at Residents' cost on termination of this Agreement. Residents shall notify Owner of any dilapidations or other defective conditions on the Leased Premises that require repairs. Residents agree not to install additional or different locks, gates or alarms on any doors or windows of the Leased Premises without written permission of Owner, unless otherwise permitted by applicable state law. If Owner approves Residents' request to install such mechanisms, Residents agree to provide Owner with a key for each lock.

**EXCEPT IN CASES OF EMERGENCIES OR FAIR HOUSING ACCOMMODATIONS, ALL NOTICES FROM RESIDENTS OR OCCUPANTS TO OWNER REGARDING REPAIRS, SERVICES, OR SECURITY MUST BE SIGNED BY RESIDENTS OR OCCUPANTS AND PROVIDED TO OWNER IN WRITTEN OR ELECTRONIC FORM ONLY, AS SPECIFIED BY OWNER.** Verbal requests from Residents, as well as written notes by Owner, Owner's employees, or agents will not be considered proper notice under this provision, and Owners compliance with Residents' verbal requests does not constitute waiver of the strict requirements of this Section. Incidents constituting emergencies include situations where persons or property are in danger of imminent harm, such as fire, smoke, flooding water, or active criminal activity. Residents must immediately notify Owner of any repairs, service issues, or security issues in the Leased Premises or at the Residential Community. Owner may temporarily interrupt services as needed to prevent property damage or perform repairs, which will not constitute a reduction in services entitling Residents to an abatement of rent, unless required by law.

14. **RISK OF LOSS OF RESIDENTS' PROPERTY.**    Except as prohibited under applicable law, Residents shall bear the risk of loss of any and all of Residents' personal property, whether located in the Leased Premises, in garage/carport, designated storage areas, or anywhere within the Residential Community. Residents agree not to hold Owner, its agents, and/or its employees liable in any manner for or on account of any loss or damages sustained by reason of the acts or omissions of third parties, or arising from any casualty (including but not limited to fire, smoke, rain, flood, water and pipe leaks, mold, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, hurricane, negligence of other residents, occupants, or invited/uninvited guests, or vandalism), unless otherwise required by law). Residents understand and agree that Residents, any members of their household, occupants, guests or invitees are not beneficiaries of any insurance policies held by Owner or Owner's agents. Owner does not maintain insurance for the Residential Community for loss or damage by fire or explosion. Owner has no responsibility to insure any of Residents' personal or property interests.

15. **ANIMALS.**    No animals are permitted without the prior written consent of Owner. Any such consent may be revoked at any time, with or without cause, by giving written notice to Residents. Except to the extent written permission is given, animals may not be brought upon the Leased Premises, whether such animals belong to Residents or to any other person. The presence of any animals as to which written permission has not been given and is not currently in force, even if such animals are "just visiting," shall be deemed a material and substantive breach of this Agreement and shall be cause for the service of a notice terminating the tenancy in accordance with applicable law.

16. **HOLD HARMLESS FOR GUESTS.**    To the extent permitted under applicable law, Residents agree to defend, protect, indemnify, and hold harmless Owner and Owner's agents against and from any and all claims, suits, liabilities, judgments, costs, demands, causes of action, and expenses, brought by Residents' occupants, guests, invitees or any other person in the Leased Premises with Residents' permission, unless due to any omission, fault, negligence, or other misconduct of Owner on or about the Leased Premises or any elevators, stairways, hallways, or other appurtenances used in connection with them not within the exclusive control of Residents. If any action or proceeding is brought against Owner or Owner's agents by reason of any such claim, upon notice from Owner, Residents shall defend the same at Residents expense by counsel reasonably satisfactory to Owner.

17. **DELIVERY OF LEASED PREMISES.**    If, for any reason, Owner is unable to provide occupancy to Residents by the scheduled first day of the Initial Term, this Agreement will continue to be in effect, and Residents' may elect one of the following remedies: a) a prorated daily abatement of rent until the date that Owner delivers possession of the Leased Premises; or b) Residents may terminate this Agreement up until such time as Owner delivers possession. Residents have a duty to mitigate their damages resulting from Owner's delay in delivering the Leased Premises. Residents' failure to take occupancy of the Leased Premises due to issues of cleanliness, repairs, or services, does not constitute a failure of Owner to deliver possession of the Leased Premises. Notwithstanding the foregoing, if Residents wrongly fail or refuse

 

to take possession of or vacate the Leased Premises before the end of the Initial Term or any Renewal Terms, Residents shall be deemed in material default of this Agreement, and Owner may sublet the Leased Premises without prior notice to Residents.

**18. RESPONSIBILITIES OF OWNER.**   Owner will act with customary diligence, and as required by applicable law, in keeping common areas reasonably clean; maintaining fixtures and appliances; complying with applicable safety, sanitation, and fair housing laws; and making reasonable repairs, subject payment by Residents for liable damages, if any. To the extent required by law, Owner will maintain the fitness and habitability of the Leased Premises and Residential Community.

    **18.1. Security.**   Owner makes no representations or guarantees to Residents concerning the security of the Leased Premises or the Residential Community. Owner is under no obligation to Residents to provide any security measure or to take any action not required by law. The presence of courtesy patrols, patrol cars, access gates, surveillance cameras, or other deterrents do not guarantee that crime can or will be prevented. All such systems are subject to personnel absenteeism, human error, mechanical malfunctions, and tampering. Residents are responsible for planning and taking action with respect to the safety of Residents and their property as if such systems and deterrents did not exist. Residents agree to immediately report all suspected or actual criminal activity to the appropriate local law enforcement agencies and, after doing so, to Owner, and shall provide Owner with such law enforcement agency's incident report number upon request.

Owner has no obligation to obtain criminal background checks on any Residents and bears no responsibility or liability related to the criminal background or actions (whether past, present, or future) of any person, even if Owner has actually run a criminal background check on applicants. Residents shall not rely on the fact that Owner may have run a criminal background check on Residents or any other applicant when deciding whether to enter into this Agreement. Background checks are limited to the information actually reviewed and are not a guarantee that a person with a criminal background does not reside at the Residential Community. Owner has not made and does not make any representations as to the background of any existing or future tenant, and Owner is under no obligation to run background checks on any existing tenant or future applicant.

**19. ACCESS.**   Owner may enter the Leased Premises under the following circumstances: 1) in case of emergency; 2) to make necessary or agreed repairs, decorations, alterations, or improvements; 3) to supply necessary or agreed services; 4) to exhibit the Leased Premises to prospective or actual purchasers, mortgagees, tenants, workers, or contractors; 5) if Residents abandon or surrender the Leased Premises; 6) pursuant to court order; 7) to perform an inspection of the Leased Premises; or 8) under any other circumstances permitted by state or local law. Owner will give Residents at least **twenty-four (24)** hours notice of Owner's intent to enter unless: a) an emergency exists; b) Residents have abandoned or surrendered the Leased Premises; c) it is impracticable to do so; or d) Residents have made a request for maintenance. Further, Owner will enter only during regular business hours unless: i) an emergency exists; ii) Residents have abandoned or surrendered the Leased Premises; or iii) Residents consent, at the time of an entry that is not during normal business hours, to the entry. Residents agree that if they deny Owner access to the Leased Premises when Owner is in compliance with statutory requirements and entitled to access, any such denial of access shall be deemed a material breach of this Agreement and shall entitle Owner to serve Residents with a notice terminating this Agreement, in accordance with applicable law.

**20. TERMINATION, DEFAULT, AND REMEDIES.**   Owner and Residents agree that all provisions, obligations, and conditions of this Agreement are reasonable and material and that a breach by Residents of any such provision, obligation, or condition constitutes a material breach thereof. Owner is entitled to all rights, remedies, and damages under this Agreement and by law, including, but not limited to, all rights and remedies for damages to the Leased Premises, cleaning charges, past and future rent due, or other amounts due under this Agreement. All rights and remedies provided in this Agreement and by law are cumulative. Residents' right to occupy the Leased Premises shall be deemed terminated after written notice of termination by Owner to Residents in accordance with applicable law. Owner may terminate Residents' right to occupy the Leased Premises upon notice required by law if a cure is not possible or if Residents do not cure the breach within the time period provided by the notice or state or local law.

**21. MOVE-OUT NOTICES AND PROCEDURES.**   Prior to moving out, Residents are required to provide Owner with **sixty (60)** days advance written notice. The move out notice must comply with the notice provision of this Agreement and provide Resident's move out date. Residents must obtain written acknowledgment from Owner of receipt of Residents' move out notice. If Owner terminates this Agreement, Owner will provide Residents with the same notice. Oral move out notice is not an acceptable form of termination. The move out date provided for in the notice cannot be changed without additional written agreement signed by both parties. Each Resident must provide Owner with their new address in writing. A move out notice does not release Residents from liability under the full term or any current renewal term of this Agreement except where Resident moves out pursuant to a Military Personnel Release or other early release permitted under applicable state or local law, or if Owner and Residents agree to such release in a written amendment signed by both parties. Residents may not withhold any portion or last month's rent under the assumption that the security deposit

Residential Lease Contract - Maryland, Certified Docs™ - Rev. 9/2022



Heather Hill by OneWall

will cover rent due. Early move out by Residents may also result in reletting expenses.

Residents, Occupants, and guests must vacate the Leased Premises on or by the agreed upon move out date, the date contained in Residents' move out notice, or Owner's notice to vacate. Upon giving Residents any required notice to quit pursuant to state or local law, Owner may pursue action for possession for any hold over after expiration of the term of this Agreement or the termination of Residents' right to occupy the Lease Premises. Additionally, Residents will be liable for hold over rent, which will be increased by twenty-five percent (25%) over the then existing rent, and rent for the full term a lease signed by a new resident, prior to Residents' hold over, who is unable to occupy the Leased Premises because of Residents' hold over.

**21.1. Cleaning.** Prior to moving out, Residents are required to clean all areas of the Leased Premises, including but not limited to, living and dining rooms, kitchens, hallways, bedrooms, closets, bathrooms, floors, outdoor walkways, patios, balconies, and any leased or assigned parking or storage areas. Residents must also comply with move out and cleaning instructions provided by Owner. If, at Owner's discretion, Residents fail to adequately clean the Leased Premises, Owner reserves the right to hire a professional cleaning service, and Residents will be liable for reasonable cleaning expenses.

**22. RESIDENTS' PERSONAL PROPERTY.** Residents shall vacate and remove all personal property from the Leased Premises upon expiration of this Agreement or termination of the Residents' right to occupy the Lease Premises without further notice or demand from Owner. Owner may remove and dispose of Residents' personal property in a manner permissible by state or local law upon termination or expiration of this Agreement, surrender, abandonment, or court ordered eviction of Resident.

**23. RELEASE OF RESIDENTS.** Unless otherwise provided for by this Agreement or by law, Residents will not be released from this Agreement.

**23.1. Military Personnel Release.** In the event Resident is a member of or subsequently enlists into, the Army, Navy, Air Force, Marine Corps, Coast Guard or member of the National Guard under call to active service authorized by the President of the United States or Secretary of Defense for more than thirty (30) consecutive days for purpose of responding to a national emergency, declared by the President and supported by Federal funds and if Resident subsequently receives permanent change of station orders or temporary change of station orders for ninety (90) days or more, including release from military service, Resident may terminate the Agreement upon delivering written notice to Owner with proof of his/her assignment. Termination will be effective thirty (30) days after the first date on which the next rental payment is due and payable after the date on which the notice is delivered. Resident must pay rent through the effective date of termination, on a prorated basis. Resident is also responsible for the cost of repairing damage to the Leased Premises caused by Resident, Occupants, or their guests or invitees, if any. This clause also applies to those persons who receive orders releasing them from military service. Owner will refund the security deposit less deductions for unpaid rent and damages, if any, within thirty (30) days of the date of termination. These provisions apply as well to dependents of Resident who are members of military service at the time a lease is signed or who subsequently enlists into the military service.

**24. MISCELLANEOUS.** This Agreement, including all applicable exhibits, schedules, addenda, or forms, sets forth all of the promises, agreements, conditions, and understandings between Owner and Residents and may not be changed or modified except by an agreement in writing signed by all parties. Residents acknowledge that all representations and statements relied upon in executing this Agreement are contained herein and that Residents in no way relied on any other statements or representations, written or oral. This Agreement and all rights of Residents arising under it are expressly agreed to be subject and subordinate to present and future recorded mortgages which are or may be placed upon the Leased Premises and all other rights afforded to the holder of any such mortgages.

**24.1. Zero Tolerance Crime Policy.** Residents, Occupants, guests, or other individuals under Residents' control: 1) shall not engage in criminal activity or engage in any act intended to facilitate criminal activity; 2) shall not engage in drug-related criminal activity, including but not limited to, the illegal manufacture, sale, distribution, use, or possession with the intent to manufacture, sell, distribute, or use of an illegal or controlled substance as defined in Section 102 of the Controlled Substance Act, 21 U.S.C. § 802; 3) shall not facilitate, use, or permit the Leased Premises to be used for criminal or drug-related criminal activity; and 4) shall not engage in any illegal activity which might negatively affect the health, safety, or welfare of Owner, Owner's agents, other residents, the Leased Premises, or the Residential Community. Owner and Residents agree that these provisions are reasonable and material and that a violation by Residents of any such provision constitutes a material breach of this Agreement and is good cause for immediate termination of tenancy.

**24.2. Satellite Dishes and Antennas.** The Federal Communications Commission states that Residents have a limited right to install a satellite dish or receiving antenna within the Leased Premises. This Agreement must be amended to incorporate requirements and restrictions prior to any installation. Residents are responsible for making sure the Leased Premises is in a location to receive the satellite signal prior to requesting permission to install. For information




Heather Hill by OneWall

on requirements and restrictions, contact Owner. Residents shall not install any external media device nor climb or have others climb upon the roof.

**24.3. Insects, Pests, and Bedbugs.**    Bedbugs are wingless parasites which may lie dormant in cracks, crevices, and personal belongings until a host is present. Residents have an affirmative duty to inspect the Leased Premises and notify Owner of the presence or infestation of insects or vermin, including bedbugs, within forty-eight (48) hours of the Residents taking possession of the Leased Premises. Absent this timely notice to Owner, Residents acknowledge and confirm that the Leased Premises are free of the presence or infestation of insects or vermin, including bedbugs. Residents agree to maintain the Leased Premises in a manner that prevents the occurrence of an infestation of insects and vermin, including bedbugs. If Residents allow individuals or items carrying bedbugs into the Leased Premises, or have repeated infestations that cannot be traced to another source, such will be deemed damage to the Leased Premises and Residents will be responsible for the cost of treatment to the Leased Premises, personal belongings, and surrounding residences, as necessary to eradicate the infestation.

**24.4. Fair Housing.**    Owner shall comply with all applicable local, state, and federal non-discrimination and fair housing laws, including laws which prohibit discrimination on the basis of race, religion, ethnic origin, national origin, color, sex, age, physical or mental disability, or family status.

**24.5. Unpaid Balances.**    With the exception of unpaid rent and late fees due on unpaid rent, all unpaid balances bear the maximum legal interest rate allowed under state and local law. Additionally, if Residents fail to pay all sums due as stated in the demand letter by the deadline stated in the demand letter, Residents shall be liable to pay all collection agency fees related to the collection of the unpaid balances.

**24.6. Sale of Leased Premises.**    In the event of a sale or pending sale of the Residential Community or in the event the Owner, new owner, lender, or lender's receiver must obtain possession of the Leased Premises in order to redevelop, renovate, or demolish the Leased Premises or any portion of the Residential Community, Residents agree that the Owner, new owner, lender, or lender's receiver shall have the right to terminate this Agreement upon sixty (60) days written notice.

**24.7. Abandonment.**    Residents shall not abandon the Leased Premises during the Initial Term or any Renewal Term. Residents' abandonment of the Leased Premises shall be deemed a material breach of this Agreement, permitting Owner to recover possession of the Leased Premises in accordance with applicable law.

**24.8. Condemnation.**    If all or a substantial part of the Leased Premises shall be taken for public use by any public authority by the exercise of eminent domain, or conveyed by deed in lieu of such taking, this Agreement and all rights of Residents under it shall immediately terminate as of the day the right to possession is taken or acquired by the public authority. Residents shall have no claim against Owner for any value of the unexpired term, nor shall Residents be entitled to any part of the condemnation award or proceeds.

**24.9. Force Majeure.**    If Owner is prevented from completing performance of any obligation hereunder by an act of God, strikes, epidemics, war, acts of terrorism, riots, flood, fire, hurricane, tornado, sabotage, or other occurrence that is beyond the control of the parties, then Owner shall be excused from any further performance of obligations and undertakings hereunder, to the full extent allowed under applicable law.

**24.10. Special Provisions.**    <u>**DAMAGE TO APARTMENT OR COMMUNITY: If the Apartment is so damaged by fire, storm or other casualty that it is uninhabitable, then this Lease shall end as of the date of the casualty and rent shall be paid up to the date you vacate the Apartment. However, if the Apartment is damaged by casualty but remains habitable, then this Lease shall continue, but your rent shall be reduced in proportion to those rooms within the Apartment which are not habitable until the Apartment has been repaired. Decks or balconies and other nonessential elements of the Apartment shall not be counted in determining the habitable parts of the Apartment. If any part of the Community is damaged by casualty, even if the Apartment is not damaged, we have the right upon thirty (30) days notice to you to end this Lease. The Lease will end as of the date specified in our notice to you and you will vacate the Apartment on or before that date. If the Apartment or any part of the Community is damaged or destroyed by fire or other casualty resulting from any negligent act by you or any of your family, guests or visitors, you are liable to us for the costs of any such damage and you shall upon demand pay us such costs as additional rent.**</u>

**24.11.** <u>**Cash is not acceptable as a form of payment. Post-dated or third party payments will not be accepted.**</u>

25. **DISCLOSURE.**    Owner may provide information on Residents or Residents' rental history to business affiliates or upon reasonable request from an authorized agent of state or federal government or law enforcement agency as permitted by applicable law.

26. **NO WAIVER.**    Owner's failure on any occasion to require strict compliance with any provision of this Agreement or to



Heather Hill by OneWall

exercise any rights arising hereunder shall not be deemed a waiver of Owner's right to subsequently enforce any such provision or to insist upon any such right. The fact that Owner may have accepted late payment(s) on one (1) or more occasions shall not be deemed a waiver of Owner's right to insist upon timely payment of rent, nor Owner's right to exercise any remedy available for late payment of rent. Acceptance of rent following a breach of this Agreement shall not be deemed to constitute a waiver of such breach. No custom or practice which may develop between the parties in the course of the tenancy shall be construed to waive the right of Owner to enforce any provision of this Agreement.

Owner's representatives (including management personnel, employees, and agents) have no authority to waive, amend, or terminate this Agreement or any part of it, unless in writing, and no authority to make promises, representations, or agreements that impose security duties or other obligations on Owner or Owner's representatives unless in writing. Except when notice or demand is required by statute, Residents waive any notice and demand for performance from Owner of Residents' default. Written notice to or from Owner's agents, representatives, or managers constitutes notice to or from Owner. All notices must be signed.

27. **SEVERABILITY.**    If a provision or paragraph of this Agreement is legally invalid, or declared by a court to be unenforceable, such provision or paragraph will be deemed deleted and the rest of this Agreement shall remain in effect. To the extent that any provision of this Agreement is in conflict with any provisions of applicable law, such provision is hereby deleted, and any provision required by applicable law which is not included in this Agreement is hereby inserted as an additional provision of this Agreement, but only to the extent required by applicable law and then only so long as the provision of the applicable law is not repealed or held invalid by a court of competent jurisdiction.

28. **APPLICABLE LAW.**    This Agreement shall be governed by the laws of the State of Maryland generally, and specifically, Title 8 of the Code of Maryland.

29. **DISCRIMINATION.**    Owner shall not discriminate against Residents in the provisions of services or in any other manner on the basis of any protected class under federal law or local fair housing laws or regulations.

30. **BANKRUPTCY.**    Subject to the requirements of the United States Bankruptcy Code, in the event the Resident is adjudicated as bankrupt (or makes and assignment for the benefit of creditors), this Agreement, at the option of Owner, shall terminate upon thirty (30) days written notice and the Leased Premises shall be surrendered to Owner, who reserves the right to repossess the Leased Premises subject to applicable provisions of law.

31. **ATTACHMENTS TO THE AGREEMENT.**    Residents certify that he/she/they have received a copy of this Agreement and the below listed attachments to this Agreement, and understand that these attachments are part of this Agreement.

| | |
|---|---|
| Amenity Addendum | Parking Storage Garage Addendum |
| Insurance Addendum | Satellite Dish and Antenna Addendum |
| Security Alarm Addendum | Utilities Addendum |
| Key, Permits & Access Device Addendum | Community Policies (Additional) |
| Animal Addendum | Mold Addendum |
| Bedbug Addendum | Lead-Based Paint Disclosure |
| Community Policies | Asbestos Disclosure Addendum |
| Lease Buy-Out Agreement | |

32. **SIGNATORIES.**    This Agreement expresses the complete understanding of the parties with respect to the subject matter set forth herein and supersedes all prior proposals, agreements, representations and understandings. The undersigned Residents, whether or not in actual possession of the Leased Premises, are jointly and severally responsible for all obligations arising hereunder. This Agreement shall not be considered to be in full force and effect until signed by Owner. Owner may, without liability, refuse to enter into this Agreement and may refuse to allow Residents to occupy the Leased Premises at any time prior to signing this Agreement. Anything to the contrary in this provision notwithstanding, Residents shall be fully liable for all obligations arising hereunder, and Owner may enforce the provisions of this Agreement against Residents if, for any reason or by any means, Residents obtain occupancy to the Leased Premises before such time as this Agreement has been signed by Owner or Owner's authorized agent.

**Residents acknowledge that this Agreement may be modified to conform to the laws of the jurisdiction in which the Residential Community is located. In the event the local laws and ordinances provide additional rights and remedies not included herein, this Agreement is amended by reference to such local laws and ordinances to incorporate the terms, rights, or remedies thereof herein. It is Owner's intent to comply with the laws of Maryland, including local county and city ordinances, and the provisions of such laws or ordinances shall supersede and control over the language of this Agreement to the extent they are in conflict.**

   **32.1. Electronic Signatures.**    The parties agree that they may enter into this transaction by electronic means; although, traditional hard copies with ink signatures may be used instead, at Owner's option or if required by law.



**Heather Hill by OneWall**

Residents agree and acknowledge that if Residents are entering into this transaction with Owner by electronic means, doing so is not conditioned on Residents' agreement to conduct the leasing transaction electronically.

INTENDING TO BE BOUND, the parties hereto have executed this Agreement as of the day and year first above written.

| | | |
|---|---|---|
| _____ | | _____ |
| Antwon Hall *(Resident)*        Date | | DEANDRE HALL *(Resident)*        Date |
| | | |
| _____ | | _____ |
| Charlene Hall* *(Resident)*        Date | | *(Owner/Agent)*        Date |

